UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2:20-CV-14342-KMM-SM

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS GITY, SR., | ) |
| | ) |
| Defendant, and | ) |
| | ) |
| THOMAS GITY, JR., | ) |
| TREASURE COAST PROPERTY | ) |
| ENTERPRISES, LLC, | ) |
| | ) |
| Relief Defendants. | ) |
| _____ | ) |

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
EXPEDITED MOTION AND MEMORANDUM OF LAW
FOR ASSET FREEZE AND OTHER RELIEF

## I.     INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission") seeks relief on an expedited basis to protect investors from further dissipation of assets purchased with investor funds as the result of a securities fraud perpetrated by Thomas Gity, Sr. ("Gity" or "Defendant"), who transferred proceeds of the scheme to Thomas Gity, Jr. ("Gity, Jr.") and Treasure Coast Property Enterprises, LLC ("Treasure Coast," and, collectively with Gity, Jr., "Relief Defendants"). From at least January 2018 to at least January 2019, Gity made material misrepresentations to investors about the success of his trading, the risk of the investments, and the cause of investor losses. Gity, a convicted felon with no known professional financial industry experience or license, made false and misleading statements, leading investors to believe he pooled investor funds in trading

accounts over which he had exclusive control, managed digital assets worth in excess of $100 million, and achieved weekly returns as high as 46.83% with no risk to investor capital.

In reality, of the $6.8 million Gity received, less than $970,000 was deposited in digital asset trading accounts.  The limited trading that Gity did perform did not achieve the profits he claimed to generate.  Instead, Gity used the digital asset trading accounts that he controlled to funnel investor funds to his own personal bank account and bank accounts controlled by his son, Gity, Jr.  The Defendant also spent investor funds on personal expenses, including for gambling and to make Ponzi-like distributions to investors.  To conceal his fraudulent scheme, Gity falsely represented that the trading account, which he falsely claimed contained in excess of $100 million in value, was no longer accessible to him because, among other things, his account was disabled by the digital asset firm where he claimed it was held.

Through his fraudulent conduct, the Defendant violated Section 17(a) of the Securities Act of 1933, and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

To protect investors and prevent further dissipation of assets, the Commission seeks this asset freeze and other relief on an expedited basis.  *See* S.D. Fla., Local Rule 7.1(d)(2); CM/ECF NextGen Admin. Proc. §10A(1).  Unless the assets of the Defendant and Relief Defendants are frozen, they will retain control over these assets and ultimately have the responsibility for using these assets to reimburse investors, a role they are utterly unfit to fulfill. The expediency lies with two private state court cases: the first filed by certain investors, who sought and obtained a *lis pendens* against real property owned by Defendant and Relief Defendants and purchased with investor funds: *Bitcoin Investors FL, LLC v. Gity*, 2019 C 00809 NC (Fla 12th Cir. Ct. 2019), and the second filed by Gity against these same investors in which he seeks dissolution of the *lis pendens*:  *Gity v. Bitcoin Investors FL, LLC*.  2020 CA-00803 (Fla. 19th Cir. Ct. 2020), A hearing

to consider dismissal or transfer of venue of the latter case is currently scheduled for October 1, 2020. The Commission respectfully requests expedited review to ensure the properties are not sold or transferred pending the outcome of this litigation.

## II.    JURISDICTION AND VENUE

This Court has personal jurisdiction over Defendant and this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), (e) and 78aa(a). Venue is proper in the Southern District of Florida, because many of Defendant's acts and transactions constituting violations of the Securities Act and Exchange Act occurred in the Southern District of Florida. In addition, at all times relevant to the Complaint, Gity and Gity Jr. resided in the Southern District of Florida, and Treasure Coast had its principal place of business in this District. Furthermore, in connection with the conduct alleged in this Complaint, Defendant, directly or indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails.

## III.    FACTS

### A.    Defendant

**Thomas Gity, Sr.**, age 64, resides in Port St. Lucie, Florida. He is retired.[1] Before he retired, Defendant was the principal of Booster Club Card, Inc., which purportedly provides fundraising services to schools and other organizations.[2]

The Defendant has never been registered with the Commission or in the financial services

---

[1] Exhibit 1 (Commission Testimony of Thomas Gity, Sr. 8/24/20) Tr. at 30:24; 31:5; 31:16-17.
[2] *Id*. at 31:5; 31:16-17; 31:21; 34:3-5.

industry in any capacity.[3]  In 1994, Gity was convicted of three felonies and served time in prison for racketeering, operating an organized crime gambling business, and conspiracy.[4]  In 2000, he was sentenced to ten years of probation on charges of embezzlement.[5]

Defendant has provided substantive testimony in this matter.  During the testimony, he asserted his Fifth Amendment privilege against self-incrimination on 24 occasions with respect to questions concerning the receipt of investor funds by his son, Gity, Jr., and the real properties at issue, among other things.[6]  He is the titleholder of one house purchased with investor funds.

## B.    Relief Defendants

**Thomas Gity, Jr.**, age 40, resides in Port St. Lucie, Florida and is currently the principal of Booster Club Card, Inc.[7]  He has never been registered with the Commission in any capacity.[8] He is the titleholder of two houses purchased with investor funds.[9]

**Treasure Coast Enterprises, LLC** is a Florida limited liability company, with its principal place of business in Port St. Lucie, Florida.[10]  Gity, Jr. is the only officer of the company.[11] Treasure Coast Enterprises, LLC is the titleholder of three houses purchased with investor funds.[12]

---

[3] *Id.* at 34:15-19; Exhibit 3 (Declaration of Kathleen Strandell), ¶ 7.

[4] Composite Exhibit 2: Criminal Records from *State v. Gity*, Case No. P1-1993-2217L (Providence, Bristol County Superior Court, Rhode Island) (Racketeering, Operating an Organized Crime Gambling Business and Conspiracy).

[5] *Id.*: *State v. Gity,* Case No. K2-2000-0056A (Embezzlement; 10 years' probation $27,270 in restitution).

[6] Ex. 1: Fifth Amendment Assertions: 12:8; 13:1,15:11; 16: 8-17; 31: 21.25; 32:13,15; 33:3; 42:9-10; 134:17-22; 138:3; 140:6; 176:11,13,21,24; 177:6; 178:19-21; 179:4,10-11; 202:18; 203:16; 204:25; 207:20; 209:6,10,13; 209:6,10,13,17,19; 210:1; 211:19.

[7] Exhibit 7: Booster Club Corporate Records from Florida Division of Records (Sunbiz.org).

[8] Ex. 3, ¶ 7.

[9] Ex. 3, ¶¶ 37-44, Ex. J.

[10] Exhibit 8: Certificate of Incorporation for Treasure Coast Property Enterprises, LLC from Florida Division of Records (Sunbiz.org).

[11] *Id*.

[12] Ex. 3, ¶¶ 45-56, Ex. J.

4

C.    **The Securities Transactions**

1.      In or around January 2018, Gity told investor Anita Perl, who was then an acquaintance, that he had learned how to successfully trade digital assets, that he had never lost money during a trading day, and that he could triple her principal investment.[13]  Based on these representations, Perl decided to invest.[14]

2.      Gity and Perl reached an oral agreement under which Gity agreed to use his purported digital asset expertise to trade her funds in digital assets.[15] They agreed that Gity would keep 20% of all trading profits and Perl would keep the remainder.[16]  In January 2018, Perl made her first investment of $12,000, which Gity deposited into his personal bank account.[17]

3.      Gity updated Perl almost daily on the purported performance of her investment.[18] Based on Gity's representations, Perl believed that Gity's trading generated massive profits.[19]  In turn, Perl introduced Gity to multiple new investors between January 2018 and December 2018.[20]

4.      Gity entered into oral agreements with some investors and entered into a written "Joint Venture Agreement" with others under which he agreed to use investor funds for the "purpose of completing Bitcoin transactions."[21] Under these agreements, investors were entitled to a percentage of the purported net profits (generally, between 50% and 80%) and Gity was entitled to the remainder.[22]

---

[13] Exhibit 4 (Declaration of Anita Perl), ¶ 2.
[14] *Id*. at ¶ 3.
[15] *Id*. at ¶¶ 2-3.
[16] *Id*. at ¶ 3.
[17] *Id*. at ¶ 3.
[18] *Id*. at ¶ 4.
[19] *Id*. at ¶¶ 4-5.
[20] *Id*. at ¶ 6.
[21] Exhibit 6 (Joint Venture Agreement 10-1-18), ¶ 4.
[22] *Id*. at ¶ 5; Ex. 10 (Declaration of Matthew Consolo), ¶3.

5.      In the written agreements, Gity represented that "he has never had a day in his previous two years of trading Bitcoin that the account has closed negative for that day" and that "there is no risk to capital being invested as all trades have an automatic sell price at each buy in price."[23]

6.      By December 2018, Gity had received approximately $6.8 million from at least eighteen investors.[24]  Investors relied on Gity's claimed expertise in digital asset trading and any investor profits would come solely from Gity's ability to generate returns.[25]

## D.      The Material Misrepresentations and Omissions

7.      The Defendant made, both orally and in writing, material misrepresentations to investors and prospective investors regarding his investments in digital assets and the use of investor funds:

8.      At least monthly and often weekly, Gity prepared for certain investors what he described as "portfolio statements."[26]  These statements displayed, among other information, the purported U.S. dollar value of digital assets that he traded for the investor and the purported U.S. dollar value of the combined digital assets that he managed for all investors, including himself.[27]

9.      Gity created the portfolio statements by using a mobile phone application called Coin Stats.[28]  Specifically, Gity manually entered purported balance and profit information from the digital asset trading accounts into the Coin Stats application and then took screenshots ("Screenshots") on his mobile phone of the portfolio statements, which displayed the information

---

[23] Ex. 6, ¶ 2.
[24] Ex. 3, ¶¶ 11-13, Ex. B.
[25] Ex. 1, 131:4-14, 132:1-4; Ex. 4, ¶¶ 2-3; Ex. 5, ¶¶ 5-6; Ex. 10, ¶¶ 3, 8 (Declarations of Perl, Chessler and Consolo).
[26] Ex. 4, ¶ 7; Ex. 10, ¶ 6; Ex. 13 (Coin Stat Screenshots).
[27] Ex. 5, ¶ 5; Ex. 10, ¶6.
[28] Ex. 13; Ex. 5, ¶ 7; Ex. 10, ¶ 11.

he entered.[29]  He sent the Screenshots directly to investors via text message or, in some cases, asked Perl to do so on his behalf.[30]

10.    As summarized in the chart below, the Screenshots represented that Gity's trading achieved weekly profits as high as 46.83% and that Gity managed as much as $100,921,738 on behalf of investors.[31]  For example, certain investors received weekly Screenshots showing the following apparent profits and total assets under management:

| Date on Screenshot | Purported Investor Account Balance | Purported Weekly Profits for Investor | Purported Investor Weekly Profits as a Percentage of Account Balance | Purported Total Assets Under Management |
|---|---|---|---|---|
| 10/14/2018 | $1,095,273 | $0.00 | 0.0% | $9,378,585 |
| 10/21/2018 | $1,254,267 | $158,900 | 12.67% | $10,445,766 |
| 10/28/2018 | $1,332,594 | $78,327 | 5.88% | $11,084,493 |
| 11/4/2018 | $1,434,735 | $102,141 | 7.12% | $14,867,034 |
| 11/11/2018 | $1,556,073 | $121,338 | 7.80% | $15,786,956 |
| 11/18/2018 | $1,832,445 | $276,372 | 15.08% | $18,366,208 |
| 11/26/2018 | $2,311,155 | $0.00[32] | 0.0% | $21,074,549 |
| 12/2/2018 | $3,745,119 | $1,433,964 | 38.29% | $35,368,000 |
| 12/16/2018 | $14,215,981[33] | $1,715,981 | 13.73% | $51,823,245 |
| 12/23/2018 | $20,872,615 | $6,656,634 | 46.83% | $75,151,489 |
| 12/30/2018 | $25,878,118 | $5,005,502 | 23.98% | $94,448,010 |
| 1/6/2019 | $17,621,333[34] | $1,621,333 | 10.13% | $100,921,738 |

11.    The information that Gity conveyed to investors in the Screenshots was fabricated. Gity represented to investors that the assets in his trading account increased from $9,378,585 on

---

[29] Ex. 4, ¶ 8.

[30] *Id.* at ¶ 5.

[31] Ex. 13.

[32] The Screenshot dated November 26, 2018 shows $0 in purported weekly profits.  In light of the week over week increase in the purported investor account balance, it appears Gity may have entered the $0 amount by mistake.

[33] This figure reflects the balance after investors asked Gity to combine two separate investments into a single investment for reporting purposes.

[34] This figure reflects the balance after Gity represented to investors that he withdrew funds from the account in order to distribute profits to them.  The investors did not receive the funds that Gity purportedly withdrew in late December 2018.

October 14, 2018, to $100,921,738 in or around January 6, 2019,[35] and that his trading achieved weekly trading profits as high as 46.83%.[36]  However, an analysis of his bank and digital asset trading records reveals that less than $970,000 of the approximately $6.8 million invested was transferred to trading accounts.[37]  Further, the profits that Gity claimed were fictitious.  Investors believed, and Gity testified, that he held or traded investor assets on three digital asset platforms – Coinbase, Binance and BitMEX.[38]  But, in Gity's Coinbase account, the net balance between January 2018 and January 2019 increased by only $10,136, and in his Binance account, the net balance between January 2018 and December 2018 decreased by approximately $170,000.[39]  Gity has produced no documentation that he held any account at BitMEX, let alone an account with a $100 million balance.  Gity testified that he does not recalling receiving any documents that would prove that he opened a BitMEX account, except for a welcome email, which he "probably" deleted.[40]

12.     Gity also misled investors about the risks of investing in his trading venture.  With certain investors, Gity entered into "Joint Venture Agreements" under which he represented that "there is no risk in the capital being invested as all trades have an automatic sell price at each buy in price," and that as a result, "the downside of the investor's capital is always protected."[41]

---

[35] Gity provided to investors a screenshot dated January 6, 2019 showing that the balance in the trading account was $100,921,738.  Ex. 13.  Yet, Gity testified that he was no longer able to access the account by December 28, 2018 and struggled to explain why the screenshot reflected a later date.  Ex. 1, pp. 149-152.

[36] Ex. 13; Ex. 5, ¶ 8.

[37] Ex. 3, ¶¶ 13 and 16, Ex. B.

[38] Ex. 1, 38:7-14, 214:17-25; Ex. 10, ¶¶ 5, 11.  Gity testified that he also traded digital assets on a platform called HitBTC in connection with a separate business venture that is not the subject this action.  Ex. 1, 103:5-22; 214:2-16.

[39] Ex. 3, ¶ 57, Ex. I and Ex. J.

[40] Ex. 1, 198:11-23.

[41] Ex. 6, ¶ 2.

13.     In fact, there were enormous risks to investor capital.  Gity used the digital asset trading accounts that he controlled to funnel investor funds to his own personal bank account and bank accounts controlled by Gity, Jr.[42]   Of the approximately $6.8 million invested, Gity misappropriated at least $4.2 million and distributed the remaining $2.6 million to investors in Ponzi-like fashion.[43]

14.     Although Gity did place some orders in his digital asset trading account, those orders did not always have an automatic sell price.[44]  As a result, the downside was not "always protected."[45]  Gity's scheme began to fall apart in December 2018, when several investors elected to take a distribution of approximately $5 million.[46]   Gity told the investors, through Perl as intermediary, that he withdrew the requested funds and would disburse them during the first few days of January 2019.[47]

15.     When the investors did not receive the distribution, they, along with Perl, attempted to contact Gity by phone and through social media.[48]  He did not respond, and by all appearances, had absconded.[49]  When a family member of one investor visited Gity's house, it appeared as though he had moved all of his belongings, including furniture, out of the house.[50]

16.     On or around January 7, 2019, Gity sent each investor a letter[51] in which he explained that "[s]everal months ago we moved all investments to the Bitmex platform."[52]  Gity

---

[42] Ex. 3, ¶¶ 19-28; Ex. 9, ¶¶6-10 Ex. I and Ex. J.
[43] Ex. 3, ¶16, Ex. B.
[44] Ex. 9, ¶ 6.
[45] Ex. 5, ¶ 5; Ex. 6, ¶ 2.
[46] Ex. 5, ¶ 12.
[47] Ex. 4, ¶ 11.
[48] Ex. 4, ¶ 11; Ex. 5. ¶ 13; Ex. 10, ¶ 12.
[49] *Id.*
[50] Ex. 4, ¶ 11.
[51] Ex. 11 (Letter from Thomas Gity, Sr.).
[52] *Id.*

claimed that "[t]rading on Bitmex continued as normal until 2 weeks ago, when [he] discovered that [he] was unable to log into the account containing [investor] funds."[53]  Gity claimed that the login failure could be the result of:  (1) "some harmless error on the Bitmex platform, perhaps complicated by the intervening holidays;" (2) "[t]he account and/or Bitmex [having] been hacked by an outside source;" or, (3) "action of Bitmex itself" to close the account.[54]  In the letter, Gity claims that he "made every effort to discover the cause of this issue, but to date" has not been successful.[55]

17.     These were lies.  Gity has not produced documentation showing that he has taken any steps whatsoever to recover the investor funds, which according to Gity, were worth in excess of $100 million on or around January 6, 2019.  Neither has Gity produced any documentation that he opened an account at BitMEX.  Further, the digital asset and bank account records produced to the Commission do not show any transfers of fiat currency or digital assets to any account at BitMEX.[56]  For its part, BitMEX was unable to find any wallets on its platform with a balance above $90 million during the time period from December 25, 2018 to January 6, 2019.[57]  The cause of the investor losses was not BitMEX or hackers, as his letter claimed, but Gity himself.

18.     As discussed above, Gity transferred less than $970,000 to digital asset trading accounts.[58]  Of the approximately $6.8 million invested, Gity misappropriated at least $4.2 million through a dizzying array of bank accounts and distributed the remaining $2.6 million to investors in Ponzi-like fashion.[59]

---

[53] *Id*.
[54] *Id*.
[55] *Id*.
[56] Ex. 3, ¶ 15, Ex. I and Ex. J.; Ex. 9, ¶¶ 6-7.
[57] Ex. 12.
[58] Ex. 3, ¶¶ 13 and 16, Ex. B.
[59] Ex. 3, ¶¶ 16 and 19-56.

19.     Gity also transferred approximately $1.8 million to accounts controlled by his son Gity, Jr.[60]  Gity, Jr. used the investor proceeds to, among other things, purchase five properties in Port St. Lucie, Florida in late 2018 and early 2019, summarized in the chart that follows.[61]  He purchased two of the properties individually and three of the properties through Treasure Coast.[62] An associate of Gity, Jr. purchased a sixth property in Port St. Lucie, Florida with investor funds, and subsequently transferred it to Gity via a quitclaim deed.

| Property Address | Legal Description and Parcel ID | Property Sale Price | Total Payments to Close | Date of Purchase |
|---|---|---|---|---|
| 1250 Coral Reef Street, Port St. Lucie, FL 34983 | Port St. Lucie-Section 03-Blk 432 Lots 40 and 41; Parcel ID 3420-510-1254 | $367,000 | $367,371 | December 28, 2018 |
| 485 SE Fairchild Avenue, Port St. Lucie, FL 34984 | Port St. Lucie-Section 18-Blk 729 Lot 14; Parcel ID 3420-585-1833 | $118,000 | $119,545 | February 5, 2019 |
| 393 SW Kestor Drive, Port St. Lucie, FL 34953 | Port St. Lucie-Section 34-Blk 2378 Lot 56; Parcel ID 3420-665-1371 | $389,800 | $393,014 | February 21, 2019 |
| 2392 SE Maslan Avenue, Port St. Lucie, FL 34952 | Port St. Lucie-Section 30-Blk 1541 Lot 42; Parcel ID 3420-645-0588 | $135,000 | $136,367 | March 1, 2019 |
| 484 SW Dahled Avenue, Port St. Lucie, FL 34953 | Port St. Lucie-Section-22-Blk 2010 Lot 12; Parcel ID 3420-605-0477 | $147,500 | $148,966 | May 14, 2019 |
| 1937 SW Taurus Lane, Port St. Lucie, FL 34984 | Port St. Lucie-Section 13- Blk 609 Lot 7; Parcel ID 3420-560-2127 | $152,000 | $153,502 | May 24, 2019 |
| | **Combined Purchase Price** | **$1,309,300** | **$1,318,765** | |

---

[60] *Id*. at ¶ 28.
[61] *Id*. at ¶¶ 36-54.
[62] *Id.*

## IV.    MEMORANDUM OF LAW

The Commission requests the following relief: (1) an Order Freezing the Assets of Defendants and Relief Defendants; (2) an Order Requiring Sworn Accountings; and (3) an Order Prohibiting the Destruction of Documents.

### A.    Standard for Obtaining An Asset Freeze Order

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).  The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required.  "Exactitude is not a requirement . . . ." *Id.* at 735 (citation and quotation omitted); *FTC v. IAB Marketing Associates, LP*, 746 F.3d 1228, 1234 (11th Cir. 2014).  The Commission's burden to demonstrate the potential for dissipation of funds is even lighter.  *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze") (internal citations omitted); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("the SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

The Court's power to freeze assets extends, as is the case here, to Relief Defendants.  *See CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *CFTC v. International Berkshire Group Holdings, Inc.*, 2006 WL 3716390, *10 (S.D. Fla. Nov. 3, 2006).  A relief defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them."  *SEC v. Huff*, 758 F. Supp. 2d 1288, 1362 (S.D. Fla. 2010), *aff'd on other grounds*, 455 F. App'x 882 (11th Cir. 2012) (unpublished).  To obtain a freeze of the Relief Defendants' assets here, the Commission "must

demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds." *Walsh*, 618 F.3d at 225.

The six real properties identified in the Strandell Declaration (Exhibit 3 at ¶¶ 30-56) should be included in the asset freeze because investor funds in the identified bank accounts (*Id*. at ¶5) were used to fund their purchase. *See, e.g., SEC v. Ahmed*, 123 F.Supp.3d 301 (D. Conn. 2015) (finding that SEC was likely to succeed on merits of claim in civil enforcement action that condominium unit was actually owned by defendant rather than by his wife and was purchased with proceeds of fraud, as required for preliminary injunctive relief freezing assets).

The Commission's evidence in this case warrants entry of the requested relief on all applicable grounds. The declarations, testimony transcripts, bank and brokerage records, marketing materials, and other exhibits attached to this motion demonstrate that the Gity has violated the antifraud provisions of the federal securities laws and, therefore, liable to investors for disgorgement and he is unfit to ensure the return of investor funds.

**B.    The Commission Has Established *Prima Facie* Violations of the Securities Laws**

The Commission has met its burden of establishing a *prima facie* showing of violations of the securities laws as alleged in the Complaint.

*1.    Gity Offered and Sold Securities*

The oral agreements and written "Joint Venture Agreements" that Gity and investors entered into constitute investment contracts and are therefore securities as defined in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Under *Howey*, an investment contract exists if there is (a) an investment of money (b) in a common enterprise (c) with the expectation of profits to be

derived solely from the efforts of others.[63]   *SEC v. ETS Payphones, Inc.,* 300 F.3d 1281, 1284 (11th Cir. 2004), *re-aff'd by SEC v. ETS Payphones, Inc.* 408 F.3d 727, 732 (11th Cir. 2005).

All three elements are satisfied here.  First, investors made an "investment of money" by furnishing fiat currency and digital assets to Defendant.[64]   Second, investors invested in a "common enterprise," as that term is defined in the Eleventh Circuit because the investors relied on Gity's purported trading expertise to generate the promised profits and because Gity was entitled to a percentage of the purported profits.  Further, Gity represented that investors were entitled to a *pro rata* share of the purported profits.  *ETS Payphones, Inc.,* 300 F.3d at 1284 (finding that a common enterprise within the meaning of *Howey* can be established by a showing of "broad vertical commonality," which requires only that investors fortunes be linked to the efforts or expertise of the promoter).  Third, investors would have reasonably expected that the purported profits from the trading would be derived from Gity's efforts because, as represented by Gity, he exercised control over the purported trading.

    2.    *Section 10(b) of the Exchange Act and Rule 10b-5(b)*

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) prohibit (1) the making of a false statement or omission necessary in order to make the statements made not misleading, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of a security.  A fact is material if there is a "substantial likelihood that a reasonable [investor] would

---

[63] In applying this efforts of others factor, the focus is on "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999), *quoting SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974).

[64] Non-cash instruments like digital assets are sufficient to meet this element.  *SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that an investment of Bitcoin, a virtual currency, constitutes "money" for purposes of the first prong of *Howey*); *U.S. v. Zaslavskiy*, 17-CR-647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018).

consider it important in deciding how to [invest]." *Basic Inc.* v. *Levinson,* 485 U.S. 224, 231 (1988).  For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Gity made materially false and misleading statements in connection with the purchase or sale of securities about how the investor funds would be used, the performance of his purported trading and the risks associated with the investment.  Gity's misrepresentations were material because an investor would consider the use of investor funds, trading performance and investment risks important when deciding to invest or to continue investing.  *See, e.g., SEC v. Lottonet Operating Corp.*, 2017 WL 6949289 (S.D. Fla. Mar. 31, 2017) ("Any reasonable investor would want to know how Defendants were really using investor funds and that Defendants were misappropriating investor money . . .").

Gity's fraudulent conduct was "in connection with" the purchase or sale of securities.  As discussed above, Gity made misrepresentations to investors and potential investors about the use of the funds, investment risks and trading profits.  Gity's misrepresentations, including the fabricated profits shown in the Screenshots, were intended to induce additional investments and keep existing investors from requesting redemptions.

Finally, Gity clearly acted with scienter:  he had to know that he was pocketing investor money and making Ponzi payments rather than investing as represented.  *SEC v. Monterosso*, 756 F.3d 1326, (11th Cir. 2014) ("Scienter may be established by a showing of knowing misconduct or severe recklessness . . . .") (citation and quotation omitted).

### 3.     *Section 17(a)(2) of the Securities Act*

Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), prohibits any person, in the offer or sale of a security, from directly or indirectly obtaining money or property by means of an

untrue statement of material fact or an omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  A violation of Section 17(a)(2) can be shown by negligent conduct.  *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).  Here, Gity obtained approximately $6.8 million of investor funds by means of his misrepresentations in the offer and sale of securities, including through his false statements about the use of investor funds and the risks of the investment, and by continuing to take in additional investments from prospective and current investors based on the fictitious profits shown in the Screenshots.  He then directly misappropriated or distributed in Ponzi-like fashion all of those funds.

4.      *Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder*

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.  Similarly, Sections 17(a)(1) and (a)(3) of the Securities Act prohibit any person from, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates or would operate as a fraud or deceit upon the purchaser.  Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), whereas negligence is sufficient for Section 17(a)(3).  *Aaron*, 446 U.S. at 691 & 697.

The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019).  In *Lorenzo,* the Supreme Court held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement

for purposes of Rule 10b-5(b), as that term was defined in *Janus*. The Court rejected Lorenzo's arguments that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct" and that all conduct relating to false statements must be charged under Rule 10b-5(b) (or, by extension, Section 17(a)(2)). *Id*. at 1102-03. Rather, the Court emphasized, there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus the same underlying conduct may establish a violation of more than one subsection. *Id.* at 1102 (*citing Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983), for the proposition that "it is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct"); *Malouf v. SEC*, 933 F.3d 1248, 1259-61 (10th Cir. 2019) (*Lorenzo* also governs interpretation of Securities Act Section 17(a)(3)).

Again, here, Gity knowingly engaged in a scheme to defraud investors. As discussed above, while continuing to offer and sell securities, Gity created and distributed screenshots that falsely represented that Gity traded investor capital contributions and that his trading generated extraordinary profits. He also made misrepresentations about the use of investor funds, the risks associated with an investment in his venture and the cause of investor losses. In addition, Gity made Ponzi-like payments to investors, which induced additional investments by creating a false impression among investors that Gity's purported trading profits were real. *See SEC v. Scoville*, 913 F.3d 1204, 1224 (10th Cir. 2019) ("[O]perating a Ponzi scheme…is 'inherently deceptive.'"). Investors continued to invest additional funds based on Gity's materially false statements and deceptive course of conduct. Through his materially false statements, and his other deceptive conduct, Gity employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1) and engaged in an "act," and a "practice, or course of business" that "operated as a fraud or deceit" on investors under Rule 10b-5(c) and Section 17(a)(3).

### C.    Disgorgement is an Appropriate Remedy

"A disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)." *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).   Disgorgement is warranted because Gity, directly and indirectly through Relief Defendants, misappropriated at least $6.8 million from investors as detailed above, which the Commission intends to seek to return to investors.. *SEC v. Monterosso,* 756 F.3d 1326, 1337 (11th Cir. 2014) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment."); *CFTC v. Gresham*, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("'An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.'") (quoting *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278907, *18 (S.D.N.Y. July 26, 2011)).

These "reasonable approximation[s] of the defendant[s'] unlawfully acquired assets . . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable." *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).   The Commission need not trace a defendant's ill-gotten gains to assets currently possessed.   *See FTC v. Leshin*, 719 F.3d 1227, 1234 (11th Cir. 2013) ("[A] disgorgement order establishes a personal liability, which the defendant must satisfy regardless whether he retains the proceeds of his wrongdoing.") (citation and quotation omitted); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset . . . .") (citation and quotation omitted), *aff'd*, 240 F. App'x 355 (11th Cir. 2007).

### D.    A Total Asset Freeze is Appropriate

The Court should freeze Defendants' assets to ensure that a disgorgement award can be

satisfied and to prevent further dissipation of investor funds.  A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award.  *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze."); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *see also FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations").

Furthermore, the Court should freeze the assets of Relief Defendants because they received investor capital circuitously transferred from Defendant.  They thus will likely be subject to a disgorgement order as well because they lack any legitimate claim to the funds they received.  *Walsh*, 618 F.3d at 226; *SEC v. George,* 426 F.3d 786, 798 (6th Cir. 2005).  A contrary conclusion "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving [assets] to friends and relatives."  *SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998).  A freeze also would prevent the possibility of further dissipation of assets.  Absent a freeze, Defendant would have the opportunity to remove Relief Defendants' ill-gotten assets, thereby depriving investors of funds that rightfully belong to them.

## E.    Sworn Accounting

In its Complaint, filed contemporaneously herewith, the Commission seeks disgorgement orders against the Defendant and Relief Defendants.  Sworn accountings by Defendant and Relief Defendants are necessary to enable the Commission and the Court to more precisely determine the amounts Defendant has raised, spent, and transferred to Relief Defendants in perpetration of the fraud, and to better identify the amount of Defendant and Relief Defendants' unjust enrichment,

as well as the assets available for disgorgement.  *See SEC v. Lybrand*, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000).

**F.     Preservation of Records**

An order requiring preservation of records is appropriate to help ensure that investor assets can be located and preserved.  *See SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 881 (S.D. Fla. 1974) (entering order prohibiting destruction or concealment of defendants' books and records).

## V.     <u>CONCLUSION</u>

For the reasons set forth above, the Commission requests that the Court grant the Commission's Expedited Motion for Asset Freeze and Other Relief and enter the Commission's proposed orders.

September 29, 2020                          Respectfully submitted,

                              By:    */s/ Wilfredo Fernandez*
                                     Wilfredo Fernandez
                                     Senior Trial Counsel
                                     Fla. Bar No. 142859
                                     Direct Dial: (305) 982-6300
                                     E-mail: fernandezw@sec.gov

                                     Alice Sum
                                     Trial Counsel
                                     Fla. Bar No. 354510
                                     Direct Dial:  (305) 416-6293
                                     E-mail: sumal@sec.gov

                                     Attorneys for Plaintiff
                                     **Securities and Exchange Commission**
                                     801 Brickell Avenue, Suite 1950
                                     Miami, FL 33131

Of Counsel:

Alexander Charap
Counsel
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, FL 33131

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on September 29, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                              s/Wilfredo Fernandez
                              Wilfredo Fernandez, Esq.

## SERVICE LIST

Michael K. Spotts
Spotts Law Offices Chartered
300 Colorado Avenue, #203
Stuart, Florida 34994
Ph: (772) 781-7878
mspotts@spottslawoffices.com

*Via Email*